# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs February 14, 2012

## STATE OF TENNESSEE v. DONALD JONES

**Appeal from the Criminal Court for Shelby County**
**No. 09-01473      Lee V. Coffee, Judge**

---

**No. W2011-00973-CCA-R3-CD  - Filed August 21, 2012**

---

The Defendant-Appellant, Donald Jones, was convicted by a Shelby County jury of first degree felony murder and especially aggravated burglary and was sentenced to consecutive sentences of life imprisonment and thirty years, respectively.  On appeal, Jones argues:  (1) the evidence was insufficient to sustain his convictions, and (2) the trial court erred in instructing the jury on flight.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Stephen C. Bush, Shelby County Public Defender; Barry W. Kuhn, Assistant Public Defender, for the Defendant-Appellant, Donald Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Raymond Lepone, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

Jones and two accomplices were intercepted by the victim, Tony Wood, during a burglary of the victim's home.  During the ensuing shoot-out, the victim and one of the accomplices were killed, and Jones was shot and wounded.

**Trial.**  Cortez Jones testified that he and William Mathis stole a truck in Mississippi on October 23, 2008.  Upon discovering that the truck did not contain anything of value,

Cortez[1] called his cousin Donald Jones, who had previously told him that he needed a stolen vehicle.

Cortez took the stolen truck to his mother's home in Memphis. Shortly thereafter, Donald Jones, Alvin Walker, and Derrick Anderson arrived at the house in Donald's Dodge Intrepid. Donald offered Cortez and Mathis drugs in exchange for the truck. Then Cortez called his friend, the victim, and told the victim that he had the money he owed him. At the conclusion of the conversation, Donald asked Cortez what the victim was doing, and Cortez told him that the victim was at work. Cortez said that he knew that Donald and Walker had wanted to steal from the victim for a long time because the victim had drugs and money in his home. Cortez said he had tried to warn the victim about Donald Jones on a prior occasion. When Donald, Walker, and Anderson heard that the victim was at work, they decided to burglarize the victim's home. Cortez said that he refused to help them with the burglary because he viewed the victim as a father figure. Cortez said that he did not warn the victim about the impending burglary that particular day because the victim was at work.

Walker and Anderson drove to the victim's house in the stolen truck, and Donald followed them in his Dodge Intrepid. Cortez said he knew that Donald usually carried a Tech Nine, an automatic weapon. He also observed Walker carrying a .38 revolver the day of the offense.

Shortly after 3:00 p.m., Cortez received a call from Donald from an unfamiliar number. Donald informed Cortez that he had been shot in a gun fight and needed help. Donald told Cortez, "Man, that n[-----] was at home – he was at home, Cuz [sic]. He shot [Walker], and I had to reach around [Walker] and shoot on him." Cortez said he was unable to help Donald and discovered that night that the victim had died in the gun fight. Cortez later identified Donald, Walker, and Mathis from photo lineups. Cortez said he confessed to stealing the truck at the time that he told the police about Donald's involvement in the victim's death. He said that the State had not given him an agreement regarding his theft case in exchange for testifying against Donald. He also said he had already served some time in prison for stealing the truck and was currently on parole for that offense.

On cross-examination, Cortez admitted that he knew Donald would want to know whether the victim was home the day of the offense. He also admitted that he did not warn the victim about the impending burglary. Cortez acknowledged that he had been originally investigated for the charge of first degree felony murder of the victim but that this charge had been dropped after he gave his statement to police. Moreover, he admitted that he owed

---

[1]Because Defendant-Appellant and two witnesses in this case share the last name of Jones, we will refer to them by their first names where necessary.

money to the victim at the time of the victim's death but denied that he was going to share in the proceeds of the victim's burglary. Cortez said he entered a guilty plea to theft of property regarding the truck he stole and admitted that he could have received a considerably harsher sentence for his offense than the one he received pursuant to his plea agreement.

Erika Jones, Cortez's sister and Donald's cousin, testified that she saw Cortez, Mathis, Donald, Walker, and Anderson at her mother's home on October 23, 2008. She also said that Donald's car, a burgundy Dodge Intrepid, was at her mother's house that day. Erika also observed a truck, with identifying letters on the back, that was parked in her mother's backyard. She later saw Mathis give a crowbar to Donald, who handled it with the sleeve of his coat so that he would not touch it with his hands. Donald then gave the crowbar to Walker, who put it behind the passenger seat of the truck. At some time after 3:00 p.m., Erika saw Donald leave her mother's home in his car and then saw Walker and Anderson follow him in the truck. Later that day, she saw a photograph of the truck that had been parked in her mother's backyard on the 5:00 p.m. news during the story about the victim's murder. Erika later identified Donald, Walker, and Mathis from photo lineups.

Starkesha Craft, the victim's niece, testified that she dropped off the victim at his home at approximately 3:00 p.m. the day that he was killed. She later learned that he died at approximately 4:00 p.m. that afternoon.

Celia Ruiz, the victim's next-door neighbor, testified that she was doing laundry when she heard several gunshots from the direction of the victim's home. She walked outside and observed an African-American male with dark skin shooting a revolver at the victim. The dark-skinned man got into the passenger side of a truck before it drove away. She said she was unable to see the individual driving the truck. Ruiz said that she never saw the victim fire a gun and that the victim did not have a weapon in his hand at the time of the shooting.

William Walker, an officer with the Memphis Police Department, testified that he responded to a call to the victim's home on Plum Valley Drive in Memphis on October 23, 2008. When he arrived, he saw the victim lying dead on the driveway. Walker was able to see inside the victim's home and observed blood on the stairwell and on the floor of the home's entrance.

Memphis Police Officer Kelvin Briggs testified that he saw a gray truck near the victim's home. He said that the abandoned truck had been left running and had a bullet hole on the right side.

Memphis Police Officer Desmond Gibbs testified that he responded to a "man down" call at the Burger King on Shelby Drive at Kirby Parkway between 3:00 and 4:00 p.m. on

October 23, 2008. Upon his arrival, he discovered Alvin Walker, who had been shot. Although Walker refused to give Officer Gibbs his name, Walker subsequently gave his name to the firefighters who put him into the ambulance. Officer Gibbs stated that Walker matched the description of one of the suspects involved in the shooting of the victim. He said Walker later died from his injuries.

Malinda Jordan, who lived a short distance away from the victim, testified that between 3:15 and 3:30 p.m. on October 23, 2008, she saw a truck with an obvious bullet hole park in front of her house. She then saw one African-American male fall out of the truck and drag himself across the street to the driver's side of a burgundy Dodge Intrepid that was parked across the street. Then she saw the driver of the truck get out of the vehicle, walk over to the Intrepid, and change clothes before getting into the passenger side of the Intrepid just before it drove away. When Jordan called 9-1-1, the operator told her that she could not move the truck because it had been involved in a recent homicide.

David Parks, a sergeant with the Memphis Police Department, testified that his investigation revealed that the victim believed that Donald Jones and Cortez Jones "were trying to set him up." Sergeant Parks said that Donald Jones's cell phone was found on the ground near the victim's front door. He said the police had received information that a witness had seen Donald Jones crawling from a gray truck to a burgundy Dodge Intrepid, so they believed that he had sustained an injury to one of his legs. Consequently, Sergeant Parks had his officers check the local hospitals for individuals with leg injuries or gunshot wounds. He then expanded this search to hospitals outside Tennessee. Sergeant Parks said that shortly after the search was expanded, Donald Jones was found at a hospital in Grenada, Mississippi. He said that the police developed Walker as a suspect because certain individuals had seen him and Donald Jones in a gray truck earlier that day. In addition, the police developed Anderson as a suspect based on the phone records from Donald Jones's cell phone. Sergeant Parks said that a skull cap was found in the gray truck and forwarded to the Tennessee Bureau of Investigation (TBI) for testing.

On cross-examination, Sergeant Parks acknowledged that the skull cap tested negative for DNA and that the fingerprints recovered from the gray truck and the victim's home did not belong to any of the suspects. In addition, he stated that none of the suspects' fingerprints were found on the crowbar that was recovered.

Memphis Police Officer Marlon Wright investigated the crime scene. He said a crowbar was found inside the victim's home and marks indicative of pry marks were found on the victim's door. He also recovered several spent .40 caliber bullet casings inside the home.

-4-

Walter Davidson, a lieutenant with the Memphis Police Department, testified that he assisted in the investigation of the victim's homicide. He said he located Donald Jones's burgundy Dodge Intrepid at the Pershing Park Apartments after Sergeant Parks instructed him to look for this vehicle in Frayser, an area of Memphis.

Dr. Miguel Laboy, an expert in the field of forensic pathology, testified that Dr. Funte performed the autopsies of the victim and Alvin Walker. Based on Dr. Funte's records, Dr. Laboy stated that the victim died of multiple gunshot wounds to the chest and Walker died of a gunshot wound to the torso.

Cervinia Braswell, a special agent with the TBI and an expert in firearms identification, testified that all of the shell casings recovered from the scene had been fired from the .40 caliber semi-automatic pistol, which had also been found at the scene. Although she could not conclusively state that the bullet recovered from Walker's body was fired from the .40 caliber pistol recovered from the scene, Agent Braswell said the bullet bore the same class characteristics. In addition, she said that the bullets recovered from the victim's body had different class characteristics than the bullets fired from the .40 caliber pistol recovered from the scene and were .38/.357 caliber-class bullets. She said that all the bullets recovered from the victim were fired from the same unknown revolver.

Michael Steward, the custodian of records for Cricket Communications, testified that the records from the cell phone used by Donald Jones showed that Donald and Anderson made several telephone calls to one another the day of the victim's death.

Donna Nelson, a special agent with the TBI and an expert in serology and DNA analysis, testified that the blood recovered from the Dodge Intrepid matched Donald Jones's DNA.

Peter Clinton, a special agent with the Mississippi Bureau of Investigation, testified that on October 23, 2008, he was called to a hospital in Grenada, Mississippi to investigate a case involving Donald Jones, who claimed that he had been shot and robbed on Interstate 55 after he had car trouble. Agent Clinton subsequently interviewed Donald, who was unable to provide a description of the two men who shot and robbed him, was unable to provide a description of his car or the suspect's car, and was unable to identify the person who drove him to the hospital. Agent Clinton later discovered that the authorities in Southaven, Mississippi had issued a warning for an African-American male who might be seeking medical treatment in Mississippi. He then contacted the authorities in Southaven, Mississippi, who immediately contacted the Memphis Police Department about Donald Jones.

Derrick Anderson, a co-defendant who was also charged with first degree felony murder and especially aggravated murder in this case, testified that the State had not promised him anything in exchange for his testimony. Anderson said that on October 23, 2008, Donald Jones offered him fifty or sixty dollars to drive a truck for him. Donald Jones, Walker, and Anderson then drove in Donald's Dodge Intrepid to a house located on East Trigg Avenue in South Memphis where a "little short fat guy" and a "tall skinny guy" that he did not know were trying to get a white truck out of the mud in the backyard. Once they freed the truck, Anderson heard Walker ask the short, fat man if he had a crowbar, and the man retrieved one from the trunk of his black Maxima and gave it to Walker. Donald then told Anderson, "[Y]ou just drive that truck over here, man; we're fixin' to run in the [victim's] house and get whatever in there out of it and come on back[.]"

Anderson said he and Walker got into the truck and followed Donald, who was driving his Dodge Intrepid, to an area a short distance away from the victim's home. Donald parked his car and got into the truck with Anderson and Walker. When they arrived at the victim's home, they parked the truck in front of the victim's house and walked to the front door. Anderson remembered that Donald had his umbrella and cell phone in his hands as they approached the victim's house. Walker pried open the front door with the crowbar, and as they were about to enter the residence, the victim walked out with a gun raised. Anderson immediately turned and ran in the opposite direction. Just before he was shot, Anderson looked behind him and saw Donald and Walker "tussling" with the victim over the gun.

After fleeing the scene, Anderson tried to call Donald but was unable to reach him. Anderson later identified Donald, Walker, Cortez Jones, and Mathis in photo lineups. He said he never saw Donald with a gun on October 23, 2008, although he saw Walker with an automatic pistol that day. On cross-examination, Anderson acknowledged that he knew he would not be convicted of first degree murder after testifying against Donald Jones at trial.

Following the close of proof, the jury convicted Donald Jones of first degree felony murder and especially aggravated burglary, and the trial court sentenced him to consecutive sentences of life imprisonment and thirty years, respectively. He subsequently filed a timely motion for new trial and an amended motion for new trial, which were denied. He then filed a timely notice of appeal.

## ANALYSIS

**I. Sufficiency of the Evidence.** Jones challenges his convictions on the basis that there was insufficient evidence corroborating Derrick Anderson's testimony. See Sherrill v. State, 321 S.W.2d 811, 814 (Tenn. 1959). He argues that none of the physical proof, including the crowbar, skull cap, baseball cap, and cell phone, connected him to the offense.

In addition, he argues that Cortez Jones, who stole the truck used to commit the offenses in this case, was an accomplice whose testimony could not be used to corroborate Anderson's testimony and whose testimony was not independently corroborated.

In response, the State argues that there was sufficient corroboration of Anderson's testimony that connected Donald Jones to the offenses in this case. In addition, the State contends that because there was no clear evidence establishing Cortez Jones as an accomplice as a matter of law, it was the jury's responsibility to make that determination. Finally, the State asserts that the testimony of Erika Jones, Celia Ruiz, and Malinda Jordan was sufficient to corroborate Anderson's testimony and to connect Donald Jones to the commission of the crimes in this case. We conclude that there was sufficient corroboration of Anderson's testimony connecting Donald Jones to the offenses in this case and that any claim that Cortez Jones was an accomplice is waived.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing

Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)). We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000). The court in Dorantes specifically adopted the standard for circumstantial evidence established by the United States Supreme Court in Holland:

> "Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more."

Dorantes, 331 S.W.3d at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)).

Donald Jones argues that the evidence was insufficient to sustain his convictions for first degree felony murder and especially aggravated burglary. As relevant here, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . burglary[.]" T.C.A. § 39-13-202(a)(2) (2006). In addition, for the purposes of this appeal, especially aggravated burglary is the burglary of a habitation where the victim suffers serious bodily injury. Id. § 39-14-404(a) (2006).

First, Donald argues that there was insufficient evidence corroborating Derrick Anderson's testimony at trial. It is well-established in Tennessee that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). An accomplice is a person who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997) (footnote omitted). The test is whether the alleged

accomplice could be indicted for the same offense with which the defendant is charged. State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); Pennington v. State, 478 S.W.2d 892, 897-98 (Tenn. Crim. App. 1971) (citations omitted). This court has previously considered the issue of whether the court or the jury determines a witness's status as an accomplice:

> "The question of who determines whether a person is an accomplice depends upon the facts of each case. When the facts of a witness' participation in a crime are clear and undisputed it is a question of law for the court to decide. When such facts are in dispute or susceptible of an inference that a witness may or may not be an accomplice, it then becomes a question of fact for the jury to decide."

State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990) (quoting Bethany v. State, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978)).

Because Anderson was indicted for the same crimes as Donald Jones, Anderson is an accomplice as a matter of law. See State v. Boxley, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). Consequently, the trial court properly instructed the jury that Anderson was an accomplice and that his accomplice testimony must be sufficiently corroborated in order to convict Donald Jones. See T.P.I.–Crim. 42.09 (15th ed. 2011). The Tennessee Supreme Court has stated the following regarding the rule of corroboration:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence."

Shaw, 37 S.W.3d at 903 (quoting Bigbee, 885 S.W.2d at 803). The jury must determine whether sufficient corroboration exists. Id.

We conclude that there was sufficient corroboration of Anderson's testimony connecting Donald Jones to the commission of the charged crimes. Cortez Jones testified that Donald Jones had wanted to steal from the victim for a long period of time and took the

stolen truck on October 23, 2008, for the purpose of burglarizing the victim. Erika Jones testified that Donald, Walker, and Anderson as well as Cortez and Mathis were at her mother's home on October 23, 2008, and that she observed a truck in her mother's backyard that day. Erika saw Mathis give a crowbar to Donald, who handled the crowbar with the sleeve of his coat so that he would not touch it with his hands. She then saw Donald give the crowbar to Walker, who put it behind the passenger seat of the truck. Sometime after 3:00 p.m. that day, Erika saw Donald leave her mother's home in his Dodge Intrepid, with Walker and Anderson following him in the truck. She then saw a photograph of the truck that had been parked behind her mother's house during the story about the victim's death on the 5:00 p.m. news. Celia Ruiz, the victim's neighbor, testified that she saw a dark-skinned African-American male shooting a revolver at the victim before getting into the passenger side of a truck before the truck drove away. Shortly thereafter, Malinda Jordan, who lived near the victim, observed two injured African-American men abandon a truck with a bullet hole and get into a burgundy Dodge Intrepid that was parked across the street. Finally, Agent Clinton testified that he detained Donald Jones in a Grenada, Mississippi hospital where he was being treated for a gunshot wound after his explanation for his injury did not make sense. Accordingly, sufficient corroboration of Anderson's testimony existed.

Second, Donald argues that Cortez Jones was an accomplice, thereby precluding the use of Cortez Jones's testimony to corroborate Anderson's accomplice testimony and requiring Cortez Jones's testimony to be independently corroborated. Although the trial court instructed the jury that Anderson was an accomplice as a matter of law, it did not instruct the jury that Cortez Jones was an accomplice as a matter or law. Alternatively, the court did not instruct the jury that the issue of whether Cortez Jones was an accomplice was a question of fact to be determined by the jury and that if Cortez Jones was found by the jury to be an accomplice, corroboration of his testimony was required. See T.P.I.–Crim. 42.09 (15th ed. 2011). However, the record shows that Donald failed to specifically request a jury instruction for Cortez Jones on the issue of accomplice testimony. This court has held that when the trial court fails to instruct the jury on the issue of accomplice testimony, it is the defendant's responsibility to request such an instruction, and the defendant's failure to do so results in a waiver of the issue on appeal:

> [O]ur supreme court has held that an instruction on the rule requiring corroboration of an accomplice's testimony is not fundamental. Upon the trial court's failure to instruct the jury regarding accomplice testimony and the requirement of corroboration, it becomes the obligation of the defendant to make a special request for the instruction. In the absence of a special request, the trial court does not err by failing to instruct the jury about accomplice testimony even if the circumstances of the case warrant such an instruction.

-10-

. . . .

> Upon the trial court's failure to instruct the jury on the issue of accomplice testimony, it became the defendant's responsibility to submit a special request. The failure to do so resulted in a waiver of the issue.

State v. Anderson, 985 S.W.2d 9, 17-18 (Tenn. Crim. App. 1997) (internal citations omitted). Accordingly, Donald's claim that Cortez Jones was an accomplice is waived. Absent Donald's request for this instruction, the trial court had no obligation to instruct the jury regarding whether Cortez Jones was an accomplice.

**II. Instruction on Flight.** Donald Jones also argues that the trial court erred in instructing the jury on flight. Specifically, he contends that the instruction should not have been given because there was no evidence that he went to Grenada, Mississippi, for any reason other than to seek medical treatment. See State v. Whittenmeir, 725 S.W.2d 686, 688 (Tenn. Crim. App. 1986) (concluding that the trial court erred in instructing the jury on flight when, after the commission of the offenses, the defendant left the scene, stayed at home until his arrest, made no attempt to flee from the arresting officer, and cooperated with the police by taking them to the stolen property and by voluntarily confessing to his part in the offenses).

In response, the State argues that there was a sufficient legal basis to give the flight instruction because the defendant knew that he would be implicated in the crime and immediately fled the area. See State v. Stafford, 670 S.W.2d 243, 246 (Tenn. Crim. App. 1984) (citing Hall v. State, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979) (holding that an instruction on flight is proper if a defendant is seen fleeing the crime scene)). Moreover, the State asserts that even if the trial court erred in giving the instruction on flight, the error was harmless given the language of the specific instruction and the overwhelming proof of Jones's guilt. See State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1994) (concluding that the trial court's instruction on flight, coupled with the overwhelming evidence of the defendant's guilt, rendered any error regarding the instruction harmless). We agree with the State that the trial court's instruction regarding flight was proper.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986) (citing State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975)). At the conclusion of the

evidence, the trial court gave the following instruction regarding flight to the jury over Jones's objection:

>        The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt[]. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves, beyond a reasonable doubt, that the defendant fled is a question for your determination.

>        The law makes no precise distinction as to the manner or method of flight. It may be open, or it may be a hurried or concealed departure; or it may be a concealment within the jurisdiction; however, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown to constitute flight.

>        If flight is proved, the fact of flight alone does not allow you to find that the defendant is guilty of the crimes alleged; however, since flight by a defendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all of the other evidence when you decide the guilt or innocence of the defendant.

>        On the other hand, an entirely innocent person may take flight, and such flight may be explained by proof offered or by the facts and circumstances of the case.

>        Whether there was flight by the defendant, the reasons for it, and the weight to be given to it are questions for you to determine.

See T.P.I.–Crim. 42.18 (15th ed. 2011). We note that the aforementioned instruction has been cited with approval by this court. See State v. Kendricks, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996) (citing State v. Payton, 782 S.W.2d 490, 497-98 (Tenn. Crim. App. 1989); Whittenmeir, 725 S.W.2d at 688.

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence exists supporting a jury instruction on flight when there is evidence of "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts

unknown." State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (internal quotation, emphasis, and citation omitted). The State may satisfy the subsequent hiding out, evasion, or concealment requirement by presenting proof from which a jury might infer that the defendant committed such acts. State v. Terrance Wilks, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App., at Jackson, Nov. 22, 1999) (citing Payton, 782 S.W.2d at 498; Rogers v. State, 455 S.W.2d 182, 186-87 (Tenn. Crim. App. 1970)).

Upon review, we conclude that there was sufficient evidence presented at trial to support the jury instruction on flight. After burglarizing the victim's home and shooting the victim, Donald Jones immediately fled the scene, abandoned the stolen truck, and traveled to Mississippi, where he was treated for a gunshot wound and gave a false story to law enforcement regarding the cause of his injury. These facts clearly support an inference that the Defendant-Appellant fled the crime scene to avoid prosecution. Accordingly, the trial court did not err in instructing the jury on flight. The judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE